# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ROBERT BURKE,                :    Case No. 3:22-CV-475 (OAW)
      Plaintiff,          :
                           :
    v.                     :
                           :
NED LAMONT, et al.,         :
      Defendants.       :    September 1, 2022

## <u>INIITAL REVIEW ORDER</u>

Pro se plaintiff, Robert Burke, currently incarcerated at MacDougall-Walker Correctional Institution, has filed a complaint pursuant 42 U.S.C. § 1983 against Governor Ned Lamont, Assistant Attorneys General Robert S. Dearington and Jacob McChesney, Acting Commissioner of Public Health Deidre S. Gifford, Claims Commissioner Christy Scott, and the following correctional employees, Commissioner Angel Quiros, Medical Director Jonny Wright, RCOO Kristen Shea, Compliance Officer Colleen Gallagher, Dietician Robert DeVeau, Warden Kristine Barone, Deputy Warden Doran, Deputy Warden Ogando, Dr. Francesco Lupis, Nurse Supervisor Tawanna Furtyk, LPN Rosalee Walker, LPN Robert B., LPN Lisa C., Nurse Gwen Hitte, and Counselor Hesse. Plaintiff states this case is based on the defendants violating the New England Interstate Compact Agreement, being deliberately indifferent, permitting a doctor to act in a retaliatory manner, and violating his right to due process. ECF No. 1 ("Complaint") at 12. Plaintiff names Defendants in their individual and official capacities but seeks only damages in his request for relief.

## I.      STANDARD OF REVIEW

Under 28 U.S.C. § 1915A, the court must review prisoner civil complaints and dismiss any portion that "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." *See* 28 U.S.C. § 1915A(b)(1)-(2).  Although highly detailed allegations are not required, the Complaint must "contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  This plausibility standard is not a "probability requirement" but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Id.*

In undertaking this analysis, the court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  However, the court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *id.*, and "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678.  Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court

to draw on its judicial experience and common sense." *Id*. at 679.

With respect to pro se litigants, it is well-established that "[*p*]*ro se* submissions are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co*., 706 F. App'x 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 3006) (per curiam)).  *See also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards that formal pleadings drafted by lawyers.'" (internal citations omitted)).  This liberal approach, however, does not exempt pro se litigants from the minimum pleading requirements described above: a pro se complaint still must "'state a claim to relief that is plausible on its face.'" *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (quoting *Iqbal,* 556 U.S. at 678).  Therefore, even in a pro se case, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted), and the court may not "invent factual allegations" that the plaintiff has not pleaded.  *Id*.

II.    **BACKGROUND**

Plaintiff alleges the following facts.  In 2009, Plaintiff was sentenced to prison in New Hampshire; he was transferred to Connecticut's Department of Correction on

3

January 13, 2012, via the New England Interstate Corrections Compact ("Compact").[1] Complaint at 12. Upon arrival in Connecticut, Plaintiff was placed in administrative segregation for five days to determine how he would adjust to the transfer. *Id.* ¶ 2. The medical department refused to contact the New Hampshire State Prison to obtain a list of Plaintiff's medications. *Id.* at 13 ¶ 3. Although Plaintiff developed cysts or boils on his groin, head, face, chest, and back, the medical department would not change his medication. *Id.* ¶ 4.

Plaintiff remained at Walker Correctional Institution until late March 2012 for assessment. Three items were listed on his Offender Accountability Plan ("OAP"): Job Assignment, Tier 2, and Voices. *Id.* ¶ 5. In March 2013, a fourth item, Good Intentions/Bad Choices, was added. *Id.* Plaintiff continued to argue with the medical unit about proper treatment for his cystic acne and boils and with the administration for a job. *Id.* ¶ 6.

In March or April 2014, Plaintiff was given a job as a tierman. *Id.* ¶ 7. He filed a petition for writ of habeas corpus seeking medical treatment and a section 1983 action in federal court for deliberate indifference. *Id.* In June 2014, Plaintiff was returned to New Hampshire for court hearings on a habeas petition filed there. *Id.* a 14 ¶ 8.

Plaintiff retuned to Connecticut on July 19, 2014, and was placed in the same block to which he was assigned before his transfer to New Hampshire. *Id.* ¶ 9. He obtained

---

[1]     Plaintiff refers to this agreement both as the New England Interstate Corrections Compact and the New England Interstate Compact Agreement. In recounting the facts, the court used the version cited by Plaintiff. The title, as codified by Section 18-102 of the General Statutes of Connecticut, appears to be "The New England Interstate Corrections Compact."

another tierman job.  *Id.* ¶ 10.  His federal lawsuit was dismissed.  *Id.*  Petitioner's state habeas case was heard in mediation in October 2014 and the respondent agreed to properly treat Plaintiff's cystic acne and boils.  *Id.* ¶ 11.

Plaintiff was seen by a dermatologist at UConn Health Center who recommended a no soy diet and "purpose soap."  *Id.* at 15 ¶ 12.  The defendants did not follow the recommendations until another mediation session was held on February 15, 2015.  *Id.*  Plaintiff received the purpose soap in April or May 2015.  *Id.* ¶ 13.  The diet began on March 15, 2015.  *Id.*  In June 2015, the defendants agreed to wash Plaintiff's clothes separately three times per week and to exchange his "whites" monthly because of bodily fluids.  *Id.*

Plaintiff withdrew his state habeas action in June 2015 and immediately was transferred to the Corrigan Correctional Institution infirmary for five days.  *Id.* ¶ 14.  When Plaintiff was transferred back to MacDougall Correctional Institution ("MacDougall"), he no longer had a job and was housed in N-pod, part of the orientation block.  *Id.* ¶ 15.  When Plaintiff finally returned to his housing unit, he unsuccessfully tried to get another job.  *Id.* at 16 ¶ 16.  Plaintiff was given a "makeshift" job of cleaning a single room each night or whenever the correctional officers wanted it cleaned.  *Id.* ¶ 17.

On October 22, 2015, Plaintiff filed an action with the Connecticut Claims Commissioner seeking $1,500,000 for medical neglect and deliberate indifference.  *Id.* ¶ 18.  He also reopened his medical habeas, claiming the defendants were not following the dermatologist's recommendations, and filed another state habeas action for improper dental treatment.  *Id.* ¶ 19.

5

Since arriving in Connecticut, Plaintiff had been trying to take in-person or correspondence classes.  *Id.* ¶ 20.  When he contacted the person in charge of such classes in the Department of Correction. she told him to be patient.  *Id.*

The defendants agreed to provide proper dental treatment and Plaintiff withdrew his dental habeas case.  *Id.* at 17 ¶ 21.

Plaintiff was seeing the dermatologist regularly.  *Id.* ¶ 22.  On October 30, 2016, Plaintiff began taking Accutane, a medication highly regulated by the federal government. *Id.*  There were many issues obtaining the medication.  *Id.* ¶ 23.  The dermatologist changed Plaintiff's diet to include Low Fat/Low Cholesterol and prescribed Eucerin Cream for dry skin.  *Id.*

Plaintiff had been trying to sign up for college courses under the Pell Program since the program became available at MacDougall but the person in charge said she never received his request.  *Id.* ¶ 24.

After Plaintiff finished his treatment with Accutane, he was transferred to Osborn Correctional Institution ("Osborn").  *Id.* at 18 ¶ 25.  Plaintiff alleges that his unit manager at MacDougall was unhappy that Plaintiff was writing to AAG Dearington to complain that the defendants were not following the agreement to exchange his white clothing.  *Id.*

When Plaintiff arrived at Osborn he signed up for a building maintenance job.  *Id.* ¶ 26.  On December 19, 2017, Plaintiff was hired for Warehouse II.  *Id.*

On February 22, 2018, Plaintiff was accused of stealing one pair of boxers, but the disciplinary report stated that twenty-one pairs were missing.  *Id.* ¶ 27.  The disciplinary report was supposed to be deferred and, according to prison directives, Plaintiff would

get a job.  *Id.*  However, on March 16, 2018, Plaintiff was issued a bad work report and, as a result, Plaintiff withdrew the deferral and opted to proceed to a hearing.  *Id.* ¶¶ 27-28.  Plaintiff was found guilty on April 3, 2018, but all sanctions were deferred except for his loss of phone privileges for forty-five days.  *Id.* at 19 ¶ 29.  Plaintiff appealed the bad work report, but the report was upheld because Plaintiff had been found with unauthorized property from the clothing factory.  *Id.* at 19 ¶ 26.[2]

Plaintiff filed a state habeas petition seeking a colonoscopy, and an ENT consultation for sleep apnea.  *Id.* ¶ 27.  On June 6, 2018, Plaintiff met with GI doctors at UConn who diagnosed colitis and recommended a High Fiber diet.  *Id.*  On June 13, 2018, Plaintiff's diet was changed to No Soy, Low Fat/Low Cholesterol, High Fiber.  *Id.* ¶ 28.  Plaintiff alleges that the kitchen supervisors apologized to him because his diet was incorrect when it was changed to Low Fat/Low Cholesterol.  *Id.*

On July 26, 2018, Plaintiff went to UConn for a sleep study and was diagnosed with sleep apnea.  *Id.* at 20 ¶ 29.  On August 2, 2018, Plaintiff returned to UConn for a colonoscopy which was normal.  *Id.*

On August 8, 2018, Plaintiff was sent to punitive segregation for fighting with his cellmate. *Id.* ¶ 30.  He was transferred to Carl Robinson Correctional Institution on August 23, 2018, but was returned to MacDougall the next day because he was allergic to bees. *Id.*  Upon his return, he was placed in Q-pod, where every other inmate was waiting for disciplinary charges to clear.  *Id.* ¶ 31.  Inmates had only two hours of daily out-of-cell

---

[2]    Paragraph 29 is followed by second paragraphs numbered 26, 27, 28, and 29.

time, and no programs or school.  *Id.*  Correctional staff denied that N-, O-, and P-pods were "ticket blocks" and said they were classification or reclassification units.  *Id.* ¶ 32.

While in Q-pod, Plaintiff repeatedly wrote to the medical unit about his cystic acne on his head, back, face, and private areas because the cysts were causing pain and itching and leaking puss and blood.  *Id.* at 21 ¶ 33.  The requests went unanswered or Plaintiff was told that he was on a list to see a doctor.  *Id.*  Plaintiff also was writing to the kitchen about issues with his special diet.  *Id.* ¶ 34.

In December 2018, Plaintiff moved to another classification unit where he could get on the work wait list.  *Id.* ¶ 35.  While in N-pod, Plaintiff began writing to the medical unit about tingling and numbness on the left side of his body.  *Id.* ¶ 36.  In January 2019, Plaintiff moved to O-pod and continued to write to the medical unit about his skin problems and the tingling/numbness.  *Id.* at 22 ¶ 37.

When Plaintiff was sent to segregation for fighting, items went missing from his property.  *Id.* ¶ 38.  He filed the required paperwork but, over the next ten months, the property officer kept sending it back saying that something was missing.  *Id.*

On February 7, 2019, Plaintiff went to trial on his state habeas regarding his skin condition.  *Id.* ¶ 39.  Although the hearing was continued, everything given to Plaintiff during mediation was entered into evidence.  *Id.*

On February 15, 2019, medical staff took pictures of Plaintiff's skin for his February 19, 2019, dermatologist appointment.  *Id.* ¶ 40.  The dermatologist ordered Accutane, a new diet of "nothing processed," and Eucerin lotion.  *Id.*

On February 18, 2019, Plaintiff was seen at emergency sick call for complaints of

no feeling in his left arm.  *Id.* at 23 ¶ 41.  When the EKG was normal, nothing else was done.  *Id.*  On February 24, 2019, Plaintiff sent a sealed envelope to RCOO Shea via U.S. mail.  *Id.*  On February 28, 2019, APRN McCrystal ordered the Eucerin lotion and a neurological appointment.  *Id.* ¶ 42. The Accutane treatment started on March 17, 2019. *Id.*  On March 14, 2019, the ENT from UConn ordered a CPAP machine for Plaintiff's sleep apnea.  *Id.* ¶ 43.

On March 21, 2019, Plaintiff wrote to Medical URC John O. and to the kitchen supervisor about his diet, and to Counselor Hesse about a job.  *Id.* ¶ 44.  On March 26, 2019, he wrote to AAG Dearington about his medical issues and about his attempts to meet with RCOO Shea.  *Id.* ¶ 45.  On April 1, 2019, Plaintiff again wrote to RCOO Shea about his medical issues and asked to meet with her.  *Id.* at 24 ¶ 46.  On April 5, 2019, Plaintiff received a letter from Deputy Warden Hines acknowledging receipt of his March 26, 2019, letters to the commissioner and to the warden.  *Id.* ¶ 47.

Plaintiff met with RCOO Shea on April 23, 2019.  *Id.* ¶ 48.  She approved the CPAP machine and neurology and dermatology appointments and scheduled an appointment for Plaintiff with APRN McPherson.  *Id.*

On May 7, 2019, the dermatologist recommended vitamins, probiotic, and a clean diet.  *Id.* ¶ 49.  On May 9, 2019, APRN McPherson ordered the vitamins and probiotic and scheduled a neurology appointment.  *Id.*

Plaintiff received the CPAP machine on June 7, 2019.  *Id.* ¶ 50.  On June 16, 2019, Plaintiff sent a manilla envelop to Warden Baron with copies of administrative remedies and letters he had sent to the medical unit in an attempt to obtain her assistance.  *Id.* at

9

25 ¶ 51.

Plaintiff attended his neurology appointment on July 15, 2019. *Id.* ¶ 52. The neurologist ordered an MRI and recommended that a medication not be crushed. *Id.* The following day, Plaintiff returned to the dermatologist for renewal of his Accutane prescription. *Id.*

On July 25, 2019, Plaintiff asked Captain Johnson about a job and was told to write to Counselor Hesse. *Id.* ¶ 53. When he did so, Plaintiff was told to be patient. *Id.* On July 25, 2019, Plaintiff asked Captain Burgos (his former supervisor), about his old job. *Id.* ¶ 54. Captain Burgos said he would look into the matter. *Id.*

On August 1, 2019, Plaintiff was called to Prompt Care/sick call and told that Nursing Supervisors Tawanna and Lydia said that Prompt Care is not for pharmacy issues. *Id.* ¶ 5.

On August 15, 2019, Plaintiff wrote to Captain Burgos about the second shift janitor job. *Id.* at 26 ¶ 56. Captain Burgos responded on September 4, 2019, stating that the job was filled and that he had asked Counselor Hesse to help Plaintiff get a job. *Id.*

On August 22, 2019, Plaintiff filed a state habeas action regarding the numbness and tingling on his left side. *Id.* ¶ 57. On September 9, 2019, Plaintiff was called to the medical unit for bloodwork. *Id.* ¶ 58. On September 12, 2019, APRN McPherson met with Plaintiff and told him that the bloodwork showed that his kidney function was elevated and his potassium was high. *Id.* Nothing was done to address these issues that day. *Id.*

On September 21, 2019, Plaintiff woke with no feeling on the left side, blurry vision, and no hearing in the left ear. *Id.* ¶ 59. The block officer refused to call the medical unit

10

at 11:00 a.m.   *Id.*   At 1:00 p.m., Plaintiff went to the medical unit and from there to the UConn Emergency Room.   *Id.*   When Plaintiff returned from UConn on September 23, 2019, he was told he needed to see mental health staff for stress.   *Id.* at 27 ¶ 60.

On October 1, 2019, the Department of Correction switched pharmacies from UConn Health to Diamond Pharmacy.   *Id.* ¶ 61.   Plaintiff had to sign up for prompt care three times to address his special soap before he was finally called on October 14, 2019. *Id.*   Plaintiff was given one bar of Dove soap on October 26, 2019, twenty-six days after he first brought the issue to the attention of the medical unit.   *Id.* ¶ 62.   On November 15, 2019, Nurse Michelle and APRN McPherson met with Plaintiff and re-wrote all medical orders including orders for soap and Accutane.   *Id.* ¶ 63.

On January 13, 2020, Plaintiff spoke with Captain Burgos and inquired about a job. *Id.* ¶ 64. On January 25, 2020, Plaintiff was called to Prompt Care, told nothing was wrong with him, and sent back to his unit.   *Id.* at 28 ¶ 65.   Two days later, Plaintiff returned to Prompt Care and was given Tamiflu, Mucinex, and aspirin to address the beginning of the flu. *Id.* ¶ 66.

On January 28, 2020, Plaintiff was offered a tierman job in O-pod.   *Id.* ¶ 67.   Plaintiff asked Counselors Bennett and Arbello how his laundry would be done because, since 2015, Plaintiff's laundry has been done separately.   *Id.*   The counselors referred the question to Counselor Hesse and Plaintiff wrote to Captain Burgos who said he would speak to Counselor Hesse.   *Id.*   Counselor Hesse was aware of the agreement because she had emailed AAG Dearington when the agreement was not being followed in August and September 2017.   *Id.* ¶ 68.   Captain Burgos told Plaintiff he had spoken with

Counselor Hesse but that he could not follow up on the issue because he was being transferred.  *Id.* at 29 ¶ 69.

On March 12, 2020, when Plaintiff was being moved to Q-pod, Counselor Hesse told Plaintiff to write to her about a job.  *Id.* ¶ 70.  Plaintiff wrote to Counselor Hesse on March 17, 2020 stating there was a need for a tierman in Q-pod.  *Id.* ¶ 70.  Counselor Hesse sent Plaintiff a work wait-list application.  *Id.*  On April 5, 2020, Plaintiff filed an administrative remedy about the job issue with Counselor Hesse.  *Id.* ¶ 72.  Warden Barone denied the grievance stating that Plaintiff had been offered a job in O-pod in January which he had declined and stated there was no formal laundry agreement that precluded him from moving from one unit to another.  *Id.*

On August 18, 2020, Plaintiff was called to the medical unit to meet with Dr. Lupis. *Id.* at 30 ¶ 73.  The doctor discontinued Plaintiff's Eucerin lotion and started to taper Plaintiff off Gabapentin, a medication recommended by two UConn neurologists.  *Id.* Plaintiff had been receiving 3600 mg of Gabapentin since May 2018 with agreement from AAG Dearington, Judge LeVine, M. Farinella, and Mary Ellen Castro.  *Id.*  Plaintiff and Dr. Lupis disagreed over his treatment so Dr. Lupis went to speak to Nurse Supervisor Furtyk and Plaintiff was sent back to his unit.  *Id.* ¶ 74.

On August 21, 2020, Plaintiff was called to the medical unit to meet with Nurse Supervisor Furtyk and Administrative Coordinator Walker about his medications and a wellness check.  *Id.* ¶ 75.

On September 2, 2020, Plaintiff received his last dose of Gabapentin.  *Id.* at 31 ¶ 76.  Over a fourteen-day period, Dr. Lupis had reduced his dosage from 3600 mg three

times per day, to 600 mg three times per day, to nothing. *Id.* Plaintiff began experiencing withdrawal and shock. *Id.*

On September 16, 2020, Plaintiff had a habeas trial about the failure to send him to a neurologist. *Id.* ¶ 77. However, as Plaintiff was seeing a neurologist, the trial was used to address Plaintiff's medication issues. *Id.* Dr. Lupis testified that Plaintiff's neurologist had agreed with discontinuing the medication and Dr. Freston testified about the dangers of the medication at high levels and abuse of the medication in prison. *Id.* ¶ 78.

On October 15, 2020, Plaintiff went to UConn for a nerve study. *Id.* at 32 ¶ 80. The doctor told Plaintiff that he did not agree to stop the medication and that his recommendation was to consider re-starting it. *Id.* On October 24, 2020, Plaintiff filed motions in the state habeas case to impeach Drs. Lupis and Freston and to have the neurologist testify. *Id.* ¶ 81. On November 9, 2020, Plaintiff filed a "Motion for Retaliatory Bias by Dr. Lupis" complaining about his medical treatment. *Id.* ¶ 82.

On November 18, 2020, Dr. Lupis told Plaintiff to withdraw his motion and, once Dr. Lupis received confirmation from the Assistant Attorney General that the motion was withdrawn, he would restart the medication. *Id.* ¶ 83.

On November 24, 2020, Plaintiff's special diet (the subject of a 2015 mediation agreement) was cancelled. *Id.* at 33 ¶ 84. Later that day, Plaintiff learned that Dr. Lupis had cancelled the diet. *Id.* ¶ 85. Dr. Lupis commented, "Mr. Burke you['re] 0-3 with me." *Id.* On November 26, 2020, Plaintiff wrote to AAG Dearington about Dr. Lupis cancelling his diet and asking him to intervene. *Id.* ¶ 86.

13

On December 8, 2020, Plaintiff contracted COVID-19 and was transferred to a COVID block. *Id.* ¶ 87. About seventy-five inmates in the housing unit contracted COVID-19. *Id.*

On January 7, 2021, Plaintiff filed another medical habeas for his skin condition because AAG Dearington had not responded to Plaintiff's letter and he had been waiting since August 2020 to see the dermatologist. *Id.* at 34 ¶ 88.

On January 18, 2021, Plaintiff wrote to the Commissioner and RCOO Shea about Dr. Lupis' treatment decisions. *Id.* ¶ 89. RCOO Shea responded on March 10, 2021, stating that she had spoken with Dr. Lupis and that he had outlined clear indications for Plaintiff's medical needs. *Id.* On January 31, 2021, Plaintiff filed a complaint about Dr. Lupis with the Department of Health seeking license verification and asking about complaints against other doctors and nurses at MacDougall. *Id.* ¶ 90.

On February 2, 2021, Plaintiff sent an envelope to Warden Barone including everything he had filed with the court and with the Department of Health. *Id.* ¶ 91. On February 8, 2021, Plaintiff sent a letter to Compliance Officer Gallagher seeking proper medical care from Dr. Lupis. *Id.* at 35 ¶ 92. On February 22, 2021, Plaintiff received a response from Warden Barone stating that RCOO Shea had "given Dr. Lupis the power to do what he wants." *Id.* ¶ 93. Compliance Officer Gallagher said she would bring Plaintiff's issues to her supervisors but never got back to Plaintiff. *Id.* ¶ 94.

Plaintiff returned to court on March 25, 2021. *Id.* ¶ 95. AAG McChesney permitted Dr. Freston to correct the misinformation in his prior testimony from September 2020, and stated that doctors disagree about treatment all the time. *Id.*

14

On March 30, 2021, Plaintiff sent a letter to Governor Lamont with copies of his letters to the commissioner, to the Department of Public Health, and to RCOO Shea.  *Id.* at 36 ¶ 96.  He has not received a response.  *Id.*

On April 9, 2021, Plaintiff received a letter from the Department of Public Health stating they would look into the issues against Dr. Lupis.  *Id.* ¶ 97.  On April 26, 2021, the Claims Commissioner dismissed plaintiff's claim.  *Id.* ¶ 98.

On June 16, 2021, the state habeas court ordered Plaintiff's Gabapentin renewed.  *Id*. ¶ 99.  On June 24, 2021, Plaintiff filed a motion to enforce the court's order which was denied without prejudice.  *Id.* ¶ 102.  On June 30, 2021, Plaintiff received his first (renewed) dose of Gabapentin.  *Id*. ¶ 101.  As the medication had been ordered on June 16, Plaintiff complained to CS Dow, Nurse Supervisor Furtyk, Deputy Warden Ogando, Deputy Warden Doran, Warden Barone, and RCOO Shea that they were in violation of a court order.  *Id.*  On August 30, 2021, there was a hearing on Plaintiff's motion to hold the commissioner in contempt for the Gabapentin issue.  *Id.*  On September 3, 2021, the judge ordered an evidentiary hearing.  *Id*. ¶ 102.

Simultaneously, regarding the exchange of Plaintiff's white clothing, Plaintiff received a response from CS Dow on June 24, 2021, who had spoken with Deputy Warden Ogando about this issue.  *Id.* ¶ 100.  Deputy Warden Ogando (a unit manager), had entered into the original agreement in place of the then-warden.  *Id.*

On July 13, 2021, Plaintiff spoke to RCOO Shea as she was touring the housing unit.  *Id.* at 38 ¶ 103.  In response to every question, she stated it was out of her control.  *Id.*

On July 21, 2021, Plaintiff was called to the medical unit to give blood in anticipation of the renewal of his Gabapentin. *Id.* ¶ 104. Later that day, a nurse came to the housing unit to take another blood sample, telling the correctional officer that he came to the unit so "Plaintiff couldn't take a bunch of pills then give blood." *Id.* The nurse was unable to get any blood because he had not inserted the needle into a vein. *Id.* ¶ 105.

On July 29, 2021, Plaintiff went to court for the medical habeas regarding his skin condition. *Id.* at 39 ¶ 106. During the hearing, which was off the record, Plaintiff asked for his diet. *Id.* AAG Dearington responded that he had not agreed to the diet in perpetuity. *Id.* Plaintiff contends that AAG Dearington permitted Dr. Freston to testify falsely as to Plaintiff's current treatment. *Id.*

On August 9, 2021, Plaintiff went to sick call because Dr. Lupis again was trying to discontinue the Gabapentin. *Id.* ¶ 107. When Plaintiff said Dr. Lupis would be in violation of a court order, Dr. Lupis responded that it would not be the first or the last time that he violated a court order. *Id.*

On September 2, 2021, Plaintiff met with RCOO Shea and Warden Barone asking for his diet, Eucerin Cream, Eucerin Advanced Cleansing Wash, and a new doctor. *Id.* ¶ 108. On September 8, 2021, RCOO Shea informed Plaintiff that he had been assigned a new medical provider, APRN Richards, and stating that all of his requests would be decided by APRN Richards. *Id.* at 40 ¶ 109.

On September 9, 2021, Plaintiff wrote to APRN Richards seeking a meeting about his medical concerns. *Id.* ¶ 110. On September 20, 2021, Plaintiff attended sick call and was told his provider would be notified about his concerns. *Id.* ¶ 111. On October 2,

16

2021, Nurse Supervisor Furtyk told Plaintiff to keep writing to APRN Richards and that eventually she would meet with him. *Id.* ¶ 112.  On October 7, 2021, Plaintiff asked Warden Barone for assistance in getting an appointment with APRN Richards, and he was directed to speak to RCOO Shea. *Id.* ¶ 114.

## III.   DISCUSSION

Plaintiff lists twenty-nine claims for relief: (1) Defendants Lamont, Quiros, Gifford, Wright, Dearington, McChesney, Scott, Shea, Gallagher, DeVeau, Barone, Doran, Ogando, Lupis, Furtyk, Walker, Robert B., Lisa C., and Hitte were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment, *id.* ¶ 116; (2) Defendant Lamont failed to follow the New England Interstate Compact and permitted his subordinates to not be held accountable in violation of the Eighth Amendment, *id.* ¶ 117; (3) Defendant Quiros failed to follow the New England Interstate Compact, permitted his subordinates to not be held accountable, and kept Plaintiff in his cell for twenty hours per day in violation of the Eighth Amendment, *id.* ¶ 118; (4) Defendant Gifford failed to ensure Plaintiff received medical care at a community standard in violation of the Eighth Amendment, *id.* ¶ 119; (5) Defendant Gifford failed to properly investigate Plaintiff's complaint thereby denying him due process in violation of the Fourteenth Amendment, *id.* ¶ 120; (6) Defendants Gifford, Wright, Shea, Gallagher, Lupis, Walker, Robert B., Lisa C., Furtyk, and Hitte failed to address Dr. Lupis' retaliatory actions and permitted him to discontinue Plaintiff's Gabapentin thereby committing the tort of negligence, *id.* ¶ 121; (7) Defendant Wright failed to ensure Plaintiff received medical care at a community standard

17

in violation of the Eighth Amendment, *id.* ¶ 122; (8) Defendant Dearington violated his Eighth Amendment rights by failing to address Plaintiff's claims that everything agreed to in the habeas proceeding was being denied, *id.* ¶ 123; (9) Defendant McChesney failed to act when he was told Dr. Lupis was being retaliatory and agreed with the violation of a court order in violation of the Eighth Amendment, *id.* ¶ 124; (10) Defendants Dearington and McChesney permitted their clients to commit perjury in violation of the Eighth Amendment, *id.* ¶ 125; (11) Defendant Scott took six years to address Plaintiff's claim against medical staff in violation of the Eighth Amendment, *id.* ¶ 126; (12) Defendant Scott's failure to comply with statutory requirements constitutes the tort of negligence, *id.* ¶ 127; (13) Defendant Shea was not properly trained in violation of Plaintiff's rights under the Eighth Amendment, *id.* ¶ 128; (14) Defendant Shea's lack of proper training to oversee medical providers constitutes the tort of negligence, *id.* ¶ 129; (15) Defendant Gallagher failed to address Plaintiff's medical issues after being informed of them in violation of the Eighth Amendment, *id.* ¶ 130; (16) Defendants Barone, Ogando, and Doran committed the tort of negligence by failing to keep Plaintiff safe from harm, *id.* ¶ 131; (17) Defendant DeVeau is not properly trained as a dietician and failed to meet Plaintiff's health guidelines in violation of the Eighth Amendment, *id.* ¶ 132; (18) Defendant Barone failed to follow the New England Interstate Compact and permitted her staff to not follow agreements made in the habeas court in violation of the Eighth Amendment, *id.* ¶ 133; (19) Defendants Doran, Ogando, and Hesse failed to follow the Compact in violation of the Eighth Amendment, *id.* ¶ 134; (20) Defendant Ogando failed to inform Warden Barone about the court agreement between Plaintiff and the Department of Correction and permitted his

18

staff to eat food allotted to Plaintiff in violation of the Eighth Amendment, *id.* ¶ 135; (21) Defendant Lupis failed to follow orders established in a habeas court mediation in violation of the Eighth Amendment, *id.* ¶ 136; (22) Defendant Lupis committed the tort of negligence by abruptly stopping Plaintiff's Gabapentin, *id.* ¶ 137; (23) Defendant Furtyk failed to ensure her nurses were performing their duties properly in violation of the Eighth Amendment, *id.* ¶ 138; (24) Defendant Scott failed to permit Plaintiff to properly address his Claims Commission claim in violation of his right to due process under the Fourteenth Amendment, *id.* ¶ 139; (25) Defendant Walker failed to address Plaintiff's issues in violation of the Eighth Amendment, *id.* ¶ 140; (26) Defendant Walker failed to comply with Administrative Directive 8.9 in violation of the Fourteenth Amendment, *id.* ¶ 141; (27) Defendants Robert B., Lisa C., and Hitte failed to ensure Plaintiff received proper medications and supplies in violation of the Eighth Amendment, *id.* ¶ 142; (28) Defendant Hesse failed to follow the Compact in violation of the Eighth Amendment, *id.* ¶ 143; and (29) Defendants Lamont, Quiros, Barone, Doran, Ogando, and Hesse had Plaintiff locked in his cell for twenty hours per day, and failed to provide proper rehabilitation in violation of the Eighth Amendment, *id.* ¶ 144.

Although Plaintiff references "retaliatory" conduct by Dr. Lupis, he asserts federal claims only for violation of his rights under the Eighth and Fourteenth Amendment. As Plaintiff specifically has listed dozens of claims and includes no First Amendment retaliation claim against Dr. Lupis, the court does not infer a retaliation claim.

A.  <u>Official Capacity Claims</u>

Plaintiff names all defendants in their individual and official capacities but seeks

only damages in his prayer for relief.  The Eleventh Amendment prohibits an award of damages against state officials in their official capacities unless the state has waived that immunity or Congress has abrogated it.  *Kentucky v. Graham*, 473 U.S. 159, 169 (1995).  Section 1983 does not abrogate state sovereign immunity.  *Quern v. Jordan*, 440 U.S. 332, 343 (1979).  Nor does Plaintiff allege facts suggesting that the state has waived immunity in this case.  Thus, as all defendants are state officials, Plaintiff cannot obtain damages from any defendant in his or her official capacity.  All official capacity claims are dismissed pursuant to 28 U.S.C. § 1915A(b)(2).

     B.  <u>New England Interstate Compact</u>

In claims 2, 3, 18, 19, and 28, Plaintiff contends that various defendants failed to comply with the Compact.  An interstate compact constitutes federal law only if: (1) it falls within the scope of the Constitution's Compact Clause; (2) it receives congressional consent; and (3) its subject matter is appropriate for congressional legislation.  *Cuyler v. Adams*, 449 U.S. 433, 439-40 (1981).  The Supreme Court of the United States explained that congressional consent is not required for interstate agreements that fall outside the scope of the Compact Clause.  *Id.* at 440.  Where an agreement is not "directed to the formation of any combination tending to increase the political power in the States, which may encroach upon or interfere with the just supremacy of the United States," it does not fall within the scope of the Compact Clause and will not be invalidated for lack of congressional consent.  *Id.* (internal quotation marks and citation omitted).

Plaintiff alleges no facts establishing that the Compact constitutes federal law as approved by Congress pursuant to the Compact Clause with subject matter appropriate

for federal legislation.  Indeed, other courts have declined to recognize a federal action under section 1983 based on the violation of provisions of the relevant interstate compact. *See Halpin v. Simmons*, 33 F. App'x 961, 963-64 10th Cir. 2002); *Ghana v. Pearce*, 159 F.3d 1206, 1208 (9th Cir. 1998); *Stewart v. McManus*, 924 F.2d 138, 142 (8th Cir. 1991); *Denham v. Schwarzenegger*, No. CVF05-0995AWIDLB, 2005 WL 3080857, at *5 (E.D. Cal. Nov. 16, 2005).  As the Ninth Circuit observed, "[t]he Compact's procedures are a purely local concern and there is no federal interest absent some constitutional violation in the treatment of these prisoners."  *Ghana*, 159 F.3d at 1208.

Further, the compact does not confer a liberty interest for purposes of a section 1983 due process claim.  *Id.* ("the Compact is not federal law and does not create a constitutionally protected liberty interest" for purposes of section 1983).  While the Compact does contain mandatory language, it does not itself "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.  *Id.* at 1209 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)); *see McCarthy v. Teta*, 101 F.3d 108, 1996 WL 115330, at *2 (2d Cir. 1996) (unpublished decision) (New England Interstate Compact does not confer liberty interest on plaintiff); *Carillo v. DuBois*, 23 F. Supp. 2d 103, 108 (D. Mass. 1998) (mandatory language in New England Interstate Compact insufficient to create liberty interest in privileges plaintiff would have had in sending state), *other parts vacated*, 32 F. Supp. 2d 35 (D. Mass. 1999) ; *see also Garcia v. Lemaster*, 439 F.3d 1215, 1219 (10th Cir. 2006) (application of [receiving state's] procedures to out-of-state inmates housed in [receiving state's] prisons does not impose an 'atypical and significant hardship' on such prisoners:); *Terry v. New Jersey Dep't of*

*Corr.*, Civil Action No. 06-3030(JBS), 2006 WL 3780761, at *4 (D.N.J. Dec. 21, 2006) ("Nothing in the Interstate Corrections Compact imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life so as to give rise to a liberty interest in transfer."); *Taylor v. Levesque*, No. 3:03CV1347(HBF), 2005 WL 3050973, at *2 (D. Conn. Nov. 10, 2005) ("Taylor cannot rely merely upon the mandatory nature of language in state statutes or prison directives to demonstrate a violation of due process. An inmate's right to have relevant laws, regulations and directives obeyed is not a federal right protected by the civil rights statute or the Constitution." (internal citation omitted)), *aff'd,* 246 F. App'x 772 (2d Cir. 2007).

As Plaintiff has not alleged facts from which the court could infer that the Compact constitutes a federal law or creates a liberty interest, violation of compact provisions does not support a federal claim.  Accordingly, the claims for violation of the Compact included in claims 2, 3, 18, 19, and 28 are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

C.  <u>State Law Negligence Claims</u>

In claims 6, 12, 14, 16, and 22, Plaintiff contends that the actions of defendants Gifford, Wright, Shea, Gallagher, Lupis, Walker, Robert B., Lisa C., Furtyk, Hitte, Scott, Barone, Ogando, and Doran constitute negligence under state law.  Under state law, state employees cannot be held liable for damages in their individual capacities based only on negligence.  Specifically, Connecticut General Statutes § 4-165 provides: "No state officer or employee shall be personally liable for damage or injury, not wanton reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her

employment."  Thus, these defendants statutorily are immune from any claim for damages based solely on negligence.

Section 4-16 does include an exception for actions found to be wanton, reckless, or malicious. The allegations against Dr. Lupis could be construed as describing reckless conduct.  Accordingly, the negligence claims against Dr. Lupis, in claims 6 and 22 will proceed.   The negligence claims against defendants Gifford, Wright, Shea, Gallagher, Walker, Robert B., Lisa C., Furtyk, Hitte, Scott, Barone, Ogando, and Doran included in claims 6, 12, 14, and 16 are dismissed pursuant to 28 U.S.C. § 1915A(b)(2).

D.  Supervisory Liability

Defendants Governor Lamont, Acting Commissioner of Public Health Gifford, Commissioner Quiros, Medical Director Wright, Warden Barone, Deputy Warden Doran, Deputy Warden Ogando, and Nurse Supervisor Furtyk are described as supervisory officials.  In claims 1, 2, 3, 4, 5, 7, 18, 20, 23, and 29, Plaintiff asserts claims against these supervisory defendants.

To recover damages under section 1983, Plaintiff must demonstrate each defendant's "personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).   Personal involvement of a government official is not established "by reason of [the official's] supervision of others who committed the violation."  *Tangreti v. Bachmann*, 983 F.3d 609, 619 (2d Cir. 2020).

In *Tangreti*, the Second Circuit clarified the standard to be applied to a claim for supervisory liability. In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court rejected a theory of supervisory liability that permitted a supervisor to be "held liable based on a

lesser showing of culpability than the constitutional violation requires." *Tangreti*, 983 F.3d a 617 (citing *Iqbal*, 556 U.S. at 677).  The Second Circuit held that "after Iqbal, there is no special rule for supervisory liability.  Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676).

Prior to *Tangreti* and *Iqbal*, the Second Circuit established five factors that could be used to show the personal involvement of a supervisory official in a constitutional violation:

> (1) the defendant directly participated in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which the unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Following *Tangreti*, the second, fourth, and fifth *Colon* factors no longer are valid ways to establish the personal involvement of a supervisory official.  *See Stone #1 v. Annucci*, No. 20-CV-1326(RA), 2021 WL 4463033, at *8 (S.D.N.Y. Sept. 28, 2021) (noting district courts' rejection of *Colon* factors after *Tangreti*).

In claims 2, 3, 18, 20, and 23, Plaintiff asserts claims of improper supervision of subordinates against Governor Lamont, Commissioner Quiros, Barone, Ogando, and Furtyk.  As improper supervision no longer supports a claim for supervisory liability, these claims are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

Plaintiff alleges that he sent packets of documents to Governor Lamont and Warden Barone seeking their assistance, sent a letter to Commissioner Quiros, informed Dr. Wright of his issues, and filed a complaint with the Department of Public Health.  Mere awareness of an issue, however, is not sufficient to state a claim for supervisory liability. "A supervisor's 'mere knowledge ...' is not sufficient because that knowledge does not amount[] the supervisor's violating the Constitution."   *Tangreti*, 983 F.3d at 616-17 (quoting *Iqbal*, 556 U.S. at 677)); *see also Lopez v. Chappius*, No. 6:17-CV06305 EAW, 2021 WL 859384, at *2 (W.D.N.Y. Mar. 8, 2021) (receipt of communication insufficient to show personal involvement; "Even before *Tangreti*, it was 'well-established that a supervisor's failure to respond to a letter of complaint does not provide a sufficient basis to find the defendant was personally involved in the deprivation alleged.'") (citations omitted).   Accordingly, the claims for supervisory liability against defendants Lamont, Barone, Quiros, Wright, and Gifford, included in claims 1, 4, 5, 7, and 29 are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

E.   Deliberate Indifference to Medical Needs

In claims 1, 13, 15, 21, 25, and 27, Plaintiff contends that various defendants deliberately were indifferent to his serious medical needs.

The Eighth Amendment forbids deliberate indifference to prisoners' serious medical needs.  *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013).  To state a claim for deliberate indifference to a serious medical need, Plaintiff must allege facts showing both that his need was serious, and that the defendants acted with a sufficiently culpable state of mind.  *See Smith v. Carpenter*, 316 F.3d 178, 184 (2d

Cir. 2003) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are both objective and subjective components to the deliberate indifference standard.

Objectively, the alleged deprivation must be "sufficiently serious."  *Spavone*, 719 F.3d at 138.  A "sufficiently serious" deprivation can exist if the plaintiff suffers from an urgent medical condition that is capable of causing death, degeneration, or extreme or chronic pain.  *See Brock v. Wright*, 315 F.3d 158, 162-63 (2d Cir. 2003); *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  It is possible that a medical condition initially may not be serious, but it may become serious because it is degenerative and, if left untreated or neglected for a long period of time, it "could result in further significant injury or the unnecessary and wanton infliction of pain."  *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000).  The Second Circuit has identified several factors that are "highly relevant" to the question of whether a medical condition is sufficiently serious, including "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."  *Chance v. Armstrong*, 143 F.3d 698, 702-03 (2d Cir. 1998).

Defendants also must have been "subjectively reckless."  *Spavone*, 719 F.3d at 138.  They actually must have been aware of a substantial risk that Plaintiff would suffer serious harm because of their actions or inaction.  Defendants "need only be aware of the risk of harm, not intend harm.  And awareness may be proven 'from the very fact that the risk was obvious.'"  *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

Negligence that would support a claim for medical malpractice does not rise to the

level of deliberate indifference and is not cognizable under Section 1983. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not" does not constitute deliberate indifference. *Farmer*, 511 U.S. at 838.  Nor does a disagreement over the treatment provided show deliberate indifference.  *See Wright v. Rao*, 622 F. App'x 46, 47 (2d Cir. 2015) (citing *Chance*, 143 F.3d at 703); *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) ("It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment . . .. [T]he essential test is one of medical necessity and not one simply of desirability." (internal quotation marks and citations omitted)).

Plaintiff describes his medical conditions as cystic acne and a neurological condition causing numbness and tingling on his left side.  He also argues that Dr. Lupis abruptly discontinued a medication he had been taking for years for an unspecified condition causing him to experience withdrawal symptoms and shock.  Although he does not identify the underlying condition, Plaintiff does indicate that the state habeas court ordered resumption of the medication.  As Plaintiff was receiving regular treatment by a dermatologist and neurologist for the first two conditions and the state court considered Plaintiff's need for the medication to be valid, the court will assume, for purposes of initial review only, that Plaintiff has serious medical needs.

In claim 1, Plaintiff generally alleges that defendants Lamont, Quiros, Gifford, Wright, Dearington, McChesney, Scott, Shea, Gallagher, DeVeau, Barone, Doran, Ogando, Lupis, Furtyk, Walker, Robert B., Lisa C., and Hitte deliberately were indifferent

to his medical needs.  This conclusory statement is insufficient to state a plausible claim. Further, the court has reviewed and dismissed the claims against defendants Lamont, Quiros, Gifford, Wright, Dearington, McChesney, Scott, DeVeau, Furtyk, and Barone in other sections of this ruling.

Plaintiff alleges only that he told Deputy Wardens Doran and Ogando that they were violating a court order when resumption of his Gabapentin did not occur until fourteen days after the medication was ordered.  Complaint ¶ 101.  As he alleges no facts suggesting that defendants Ogando and Doran were involved in ordering his medication in response to the court order or were responsible for the delay in receipt of the medication, Plaintiff's allegation against Defendants Ogando and Doran is conclusory and thus is dismissed.  *See Chavis*, 618 F.3d at 170 (conclusory statement insufficient to state plausible claim for relief).

The court considers below the claims against members of the medical staff Lupis, Shea, Gallagher, Robert B., Lisa C., and Hitte.

   i.   <u>Dr. Lupis</u>

In claim 21, Plaintiff contends that Dr. Lupis failed to comply with court orders regarding his medical treatment.  In his statement of facts, however, Plaintiff alleges that Dr. Lupis abruptly discontinued his Gabapentin causing him to experience withdrawal and, after the court ordered the medication restored, attempted to discontinue it a second time.  Complaint ¶¶ 73, 76, 107.  Plaintiff also alleges that Dr. Lupis discontinued the special diet prescribed by his specialists to address his skin and nerve issues.  *Id.* ¶ 85. While at times Plaintiff's claims are unclear, the court considers Plaintiff's allegations

regarding Dr. Lupis's treatment to be sufficient to plausibly allege an awareness of (and a disregard for) the harm Plaintiff could suffer as a result of the doctor's actions. Accordingly, the deliberate indifference claim will proceed against Dr. Lupis.

      ii.    Nurses Robert B., Lisa C., and Hitte

In claim 27, Plaintiff states that Nurses Robert B., Lisa C., and Hitte refused to help him get proper medications or supplies. To state a cognizable Section 1983 claim, Plaintiff must allege facts showing the personal involvement of each defendant in the alleged constitutional violation. *Costello v. City of Burlington*, 632 F.3d 41, 48-49 (2d Cir. 2011) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

Plaintiff makes no reference to these nurses in his statement of facts. He alleges only that they work at MacDougall. As Plaintiff alleges that primarily he was confined at MacDougall since 2015, his complaint fails to provide sufficient information to identify the basis for the deliberate indifference to medical needs claims asserted against these nurses. As the court cannot determine whether Plaintiff can state a cognizable claim, the court will permit Plaintiff to amend his complaint to include specific allegations against defendants Robert B., Lisa C., and Hitte.

The limitations period for filing a section 1983 action in Connecticut is three years. *Thompson v. Rovella*, 734 F. App'x 787, 788-89 (2d Cir. 2018); *see also Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir. 1994) (analyzing available state limitations periods and determining that appropriate limitations period for section 1983 actions filed in Connecticut is three years). Plaintiff filed this action on April 4, 2022. Thus, only actions occurring after April 4, 2019 are within the limitations period. Plaintiff should include in

his amended complaint only allegations relating to his treatment by these defendants after April 4, 2019.

      iii.   <u>Rosalee Walker and Compliance Officer Gallagher</u>

In claim 25, Plaintiff contends that Defendant Walker brushed him aside and failed to address his medical issues.  He does not allege when this meeting occurred.  The only meeting mentioned in the statement of facts is an August 21, 2020, meeting with Defendants Walker and Furtyk to discuss his medication and to undergo a wellness check.  Complaint ¶ 75.  Nothing in this allegation suggests that Defendant Walker disregarded a substantial risk of harm as required to state a claim for deliberate indifference to medical needs.  The court cannot establish allegations that Plaintiff has not pleaded.  *See Chavis*, 618 F.3d at 170.  Accordingly, the claim against Defendant Walker is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

In claim 15, Plaintiff states that Defendant Gallagher was informed about his medical issues but that she did not address them.  However, in his statement of facts, he states that he sent a letter to Defendant Gallagher on February 8, 2021, and that Defendant Gallagher said that she would convey the issues to her supervisors.  While Plaintiff alleges that he never heard back, he also alleges that he received a response from Warden Barone.  Complaint ¶¶ 92-94.  As Warden Barone responded to the issues in his letter to Defendant Gallagher, there was no need for Defendant Gallagher to respond as well.  The court can discern no constitutional violation from the facts alleged.  The claim against defendant Gallagher is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

      iv.   <u>RCOO Shea</u>

In claim 13, Plaintiff contends that RCOO Shea's lack of training put his life in grave danger.  He does not allege any facts supporting this claim.  In his statement of facts, however, Plaintiff alleges that, in April 2019, Defendant Shea approved his CPAP machine and dermatology and neurology appointments and scheduled an appointment with APRN McPherson.  Complaint ¶ 48.  In January 2021, in response to Plaintiff's complaints, Defendant Shea spoke with Dr. Lupis about his treatment decisions, *id.* ¶ 89, and in September 2021, in response to further complaints, she assigned Plaintiff a new medical provider.  *Id.* ¶ 109.  Thus, the facts alleged do not identify deficient training.  Plaintiff cannot mention a claim without providing factual support for that claim.  *See Monger v. Connecticut Dep't of Transp.*, No. 3:17-CV-00205(JCH), 2017 WL 3996393, at *5 (D. Conn. Sept. 11, 2017) (merely mentioning claim is insufficient to state claim upon which relief may be granted).  The claim against Defendant Shea is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

F.  Claims Commissioner Scott

In claims 11 and 24, Plaintiff contends that defendant Scott, the Connecticut Claims Commissioner, failed to permit him to properly present his claim and decided his claim in an untimely manner.

It is well established that judges and other officials conducting quasi-judicial proceeding absolutely are immune from civil suit "for malice or corruption in their action whilst exercising their judicial functions within the general scope of their jurisdiction."  *Butz v. Economu*, 438 U.S. 478, 509 (1978) (internal quotation marks and citation omitted).  Absolute judicial immunity has been extended to various agency officials who share

enough characteristics of the judicial process to warrant this protection. *See, e.g., id*. (Department of Agriculture hearing examiner); *Gyadu v. Workers' Compensation Comm'n*, 930 F. Supp. 738, 748-49 (D. Conn. 1996) (workers' compensation commissioner).

To determine whether absolute immunity should be afforded, the court should evaluate several factors including: "(a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal." *Moriarty v. Brooks*, 111 F. App'x 30, 31 (2d Cir. 2004) (remanding case to district court to evaluate these factors to determine whether Connecticut Claims Commissioner is protected by absolute immunity).

The Claims Commissioner determines whether a lawsuit against the state should be authorized.  Conn. Gen. Stat. §§ 4-141, 4-142, 4-160.  As claims presented to the commissioner are the only way to obtain a monetary award from the state, "[t]he disappointment occasioned by an adverse decision often finds vent in imputations of malice" against the person making the decision. *Butz*, 438 U.S. at 513 (internal quotation marks omitted).  Thus, there is a need to ensure that the commissioner can perform her functions without harassment or intimidation, the first factor.  The proceedings clearly are adversarial with the claimant seeking money from the state and the commissioner determining whether such claim appropriately is asserted.  Finally, Section 4-158 provides

a right of review by the Connecticut General Assembly of the denial of any claim for more than $50.00.  This right of review affords a safeguard for any unconstitutional conduct or error by the commissioner, satisfying the second and sixth factors.  As the commissioner's functions are comparable to those of other judicial and quasi-judicial officers who have been afforded absolute immunity, the court concludes that the commissioner is protected by absolute immunity.  The claims against Defendant Scott are dismissed pursuant to 28 U.S.C. § 1915A(b)(2).

     G. <u>Assistant Attorneys General Dearington and McChesney</u>

     Claims 8, 9, and 10, are asserted against Assistant Attorneys General Dearington and McChesney.  Plaintiff contends that AAG Dearington failed to intervene when informed that the defendants were not complying with the agreement made to resolve one habeas action.  AAG McChesney did nothing when informed that his client, Dr. Lupis, was "being retaliatory" and agreed with Dr. Lupis' disregard of a court order, and both defendants permitted their clients to commit perjury during court proceedings.

     Prosecutors are protected from suit under section 1983 by absolute prosecutorial immunity in all matters associated with their prosecutorial functions, regardless of motivation.  *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (prosecutorial immunity covers virtually all acts associated with the prosecutor's function).  Prosecutorial immunity has been extended to government attorneys who appear in litigation or court proceedings representing the government entity.  *See Contreras v. Perimenis*, 562 F. App'x 50, 51 (2d Cir. 2014) (extending absolute immunity to AAF sued as government advocate); *see also Barrett v. United States*, 798 F.2d 565, 572 (2d Cir. 1986) ("Although government defense

33

counsel, not having selected the other party as target of the litigation, is in a more passive position that a prosecutor or plaintiff's representative, he nevertheless functions in an adversarial arena where 'there is, if not always a winner, at least one loser,' and since he is charged with a public trust he should not be inhibited in the faithful performance of his duties by the threat of harassing lawsuits against him." (citation omitted)).  These duties extend to statements made or advice given to their clients.  *See Boyd v. Arnon*e, 48 F. Supp. 3d 210, 21-16 (D. Conn. 2014) (AAG protected by absolute immunity regarding any advice given to client during representation).  Thus, Defendants Dearington and McChesney are protected by absolute immunity and the claims against them relating to the state litigation are dismissed pursuant to 28 U.S.C. § 1915A(b)(2).

In addition, Defendants Dearington and McChesney are counsel for the Department of Correction and its employees.  This position "does not vest [them] with authority to regulate or direct the way [their] clients conduct their duties."  *Ziemba v. Lynch*, No. 3:11CV97(SRU), 2013 WL 232543, at *5 (D. Conn. Sept. 17, 2013) (citations omitted).  As Defendants Dearington and McChesney had no supervisory authority over the correctional defendants, they cannot be held liable for the defendants' failure to adhere to court agreements and follow court orders.  *See id.*  The remaining claims against Defendants Dearington and McChesney are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

H. <u>Grievance Procedures</u>

In claim 26, Plaintiff contends that Defendant Walker violated his Fourteenth Amendment rights by failing to comply with the rules in Administrative Directive 8.9.  He

contends that she was not at work during the times the doctors were on duty and only emptied the medical grievance box once a month.

Administrative Directive 8.9 sets forth the procedures for filing administrative remedies regarding health issues. *See* portal.ct.gov/DOC/AD/AD-Chapter-8. However, inmates have no constitutional entitlement to grievance procedures, to receive a response to a grievance, or even to have a grievance processed properly. *See Riddick v. Semple*, 731, F. App'x 11, 13 (2d Cir. 2018) (claim relating to grievance procedures "confuses a state-created procedural entitlement with a constitutional right[]"; "neither state policies nor 'state statutes ... create federally protected due process entitlements to specific state-mandated procedures[]") (quoting *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003)); *see also Lopez v. McGill*, No. 3:08CV01931(CSH), 2009 WL 179787, at *5-6 (D. Conn. Jan. 31, 200() (denial of access to, or violation of, grievances procedures does not violate constitutionally protected right).

As Plaintiff has no constitutionally protected right to have Defendant Walker comply with grievance procedures, this claim is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

I. Conditions of Confinement

In claim 29, Plaintiff contends that Defendants Barone, Doran, Ogando, and Hesse had him locked in his cell for twenty hours a day and failed to provide proper rehabilitation. In claim 3, he argues that Defendant Quiros had him locked in his cell for more than twenty hours per day.

An inmate must meet two requirements in order to state an Eighth Amendment claim against a prison official based on the inmate's conditions of confinement. *McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020). First, the inmate must allege that "objectively, the deprivation the inmate suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities.'" *Id.* Second, the inmate must allege that, "subjectively, the defendant official acted with 'a sufficiently culpable state of mind . . ., such as deliberate indifference to inmate health or safety.'" *Id.* (alteration in original). "Conditions of confinement inflict cruel and unusual punishment when they result 'in unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measure of life's necessities.'" *Id.* Whether incarceration under restrictive conditions violates the Eighth Amendment, depends on the duration of the confinement as well as the conditions themselves. *See Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015).

Plaintiff does not identify in this claim when he was housed under these conditions or the length of time he was held under the conditions. In his statement of facts, the only reference to restrictive conditions is that Plaintiff was afforded only two hours of out-of-cell time per day when he was housed in Q-pod in August 2018. Complaint ¶¶ 31-32. As noted above, the limitations period for filing a section 1983 action is three years. As Plaintiff's only allegation regarding these conditions relates to more than three years before he filed this action, the conditions of confinement claim is dismissed as time-barred.

36

In addition, Plaintiff asserts this claim against Commissioner Quiros, Warden Barone, and Deputy Wardens Doran and Ogando.  As these are all supervisory defendants, Plaintiff must allege facts showing that they actually were involved in his placement, *i.e.*, that they ordered or approved the placement.  Here it appears that Plaintiff merely assumes their involvement because they are supervisors.  As explained above, this is insufficient to support a claim for supervisory liability.

Plaintiff may amend his complaint to re-assert this claim if he can show that he was confined under such conditions within the limitations period and the conditions and duration of his confinement were of constitutional dimension and identify the persons who actually ordered such confinement.

J.  Dietician DeVeau

In claim 17, Plaintiff contends that Defendant DeVeau is not properly trained as a dietician or nutritionist resulting in his "not properly meeting health guidelines."  In his statement of facts, Plaintiff alleges only that when his diet was changed to No Soy, Low Fat/Low Cholesterol, and High Fiber in June 2018, the kitchen supervisors apologized to him because his diet was incorrect when it was changed to Low Fat/Low Cholesterol in 2016.  Complaint ¶ 28.  The court assumes this allegation is the basis for Plaintiff's claim against Defendant DeVeau.  However, the error occurred and was corrected beyond the limitations period for filing a section 1983 action.  Thus, the claim against defendant DeVeau is dismissed as time-barred.

Further, even if the claim were timely, Plaintiff has alleged no facts suggesting that Defendant DeVeau had the requisite subjectively culpable state of mind to support a claim

for unconstitutional conditions of confinement based on an improper diet.  *See Martinez v. Lape*, No. 9:09-CV-0665(TJM/RFT), 2011 WL 4527943, at *8 (N.D.N.Y. Mar. 28, 2011) (plaintiff must show that defendant intentionally denied or interfered with medically required diet), *report and recommendation adopted*, 2011 WL 4528980 (N.D.N.Y. Sept. 28, 2011).

      K.  Counselor Hesse

      In claim 28, Plaintiff alleges that Counselor Hesse denied him due process by acting unprofessionally.  As most of Plaintiff's allegations regarding Counselor Hesse concern Plaintiff's attempts to get a prison job, the court considers a claim against Counselor Hesse for denial of a prison job.

      Inmates have no constitutional right to a prison job.  *Ashby v. Quiros*, 443 F. Supp. 3d 232, 252 (D. Conn. Mar. 10. 2020) (inmates have no constitutionally protected interest in prison employment); *see also Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987) (no constitutional right to a prison job absent underlying state law mandating jobs for prisoners).  Nor do state statutes or prison regulations create a protected liberty interest in prison employment.  *Ashby*, 443 F. Supp. 3d at 252-58.  As Plaintiff has no right to a prison job, his claim against Counselor Hesse is dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

## ORDERS

      All claims against the defendants in their official capacities and all claims except the claims for deliberate indifference to medical needs against Dr. Lupis and the supplemental state law negligence claim against Dr. Lupis are **DISMISSED** pursuant to

28 U.S.C. § 1915A(b)(1).

The case will proceed on the Eighth Amendment deliberate indifference to medical needs and state law negligence claims against Dr. Lupis in his individual capacity only.

Plaintiff may file an amended complaint if he can allege facts showing that Defendants Robert B., Lisa C., and Hitte were deliberately indifferent to his medical needs. He also may amend if he can allege supporting facts and identify a proper defendant for his Eighth Amendment conditions of confinement claim regarding confinement in his cell for twenty hours per day. The amended complaint also shall include the deliberate indifference and negligence claims against Dr. Lupis, but not any of the claims that were dismissed in this order. Any amended complaint shall be filed within **thirty days** from the date of this order. If no amended complaint is filed within the time specified, the case will proceed only on the claims against Dr. Lupis.

The court enters the following additional orders.

(1)     **The Clerk shall** verify Dr. Lupis's current work address with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet containing the Complaint and this Order to Defendant Lupis at the confirmed address within **twenty-one (21) days** of this Order, and report to the court on the status of the waiver request on the thirty-fifth day after mailing. If the defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on the defendant in his individual capacity and the defendant shall be required to pay the cost of such service.

(2)     T**he Clerk shall** send Plaintiff a copy of this Order.

39

(3)     Defendant shall file his responses to the complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the waiver forms are sent.  If he chooses to file an answer, he shall admit or deny the allegations and respond to the cognizable claims recited above.  He also may include all additional defenses permitted by the Federal Rules.

(4)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed  by **March 30, 2023** from the date of this order.  Discovery requests need not be filed with the court.

(5)     All motions for summary judgment shall be filed on or before **May 31, 2023** from the date of this order.

(6)     Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed.  If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(7)     If Plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the court.  Failure to do so can result in the dismissal of the case.  Plaintiff must give notice of a new address even if he is incarcerated. Plaintiff should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address.  If Plaintiff has more than one pending case, he should indicate all the case numbers in the notification of change of address.  Plaintiff should also notify Defendants or the attorney for Defendants of his new address.

(8)     Plaintiff shall utilize the Prisoner E-filing Program when filing documents with the court.  Plaintiff is advised that the Program may be used only to file documents with the court. As local court rules provide that discovery requests are not filed with the court, discovery requests must be served on defendants' counsel by regular mail.  In addition, Plaintiff must serve copies of all documents by regular mail on any defendant who does not participate in electronic filing.

**IT IS SO ORDERED** at Hartford, Connecticut, this 1st day of September 2022.

*/s/ Omar A. Williams*
Omar A. Williams
United States District Judge

41